UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
  PLAINTIFF,                    )        CASE NO. 2:19-cr-82
                                )
       vs.                     )
                                )
JASON E. ADKINS,                )
                                )
  DEFENDANT.                    )
_____)

TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE
AUGUST 26, 2022; 9:15 A.M.
COLUMBUS, OHIO


  APPEARANCES:

  FOR THE PLAINTIFF:
      KENNETH L. PARKER
      United States Attorney
      By:  S. Courter Shimeall
          Peter K. Glenn-Applegate
      Assistant United States Attorneys
      303 Marconi Boulevard
      Columbus, Ohio  43215

  FOR THE DEFENDANT:
      Peterson Conners LLP
      By:  Gregory S. Peterson, Esq.
      545 Metro Place South, Suite 435
      Dublin, Ohio  43017


- - -


      Proceedings recorded by mechanical stenography,
transcript produced by computer.

2

1          FRIDAY MORNING SESSION

2          AUGUST 26, 2022

3                    – – –

4          THE DEPUTY CLERK:  Case No. 2:19-cr-82, United States

5    of America versus Jason E. Adkins.

6          THE COURT:  Would counsel please identify themselves

7    for the record beginning with counsel for the government.

8          MR. SHIMEALL:  Good morning, Your Honor.  Courter

9    Shimeall.  I'm joined by my colleague, Peter Glenn-Applegate,

10   on behalf of the United States.

11         THE COURT:  Good morning, Mr. Shimeall, Mr.

12   Glenn-Applegate.

13         Counsel for the defense.

14         MR. PETERSON:  Good morning, Your Honor.  Greg

15   Peterson on behalf of Jason Adkins who is seated here to my

16   right.

17         THE COURT:  Good morning, Mr. Peterson.

18         Mr. Shimeall, what is the status of this proceeding?

19         MR. SHIMEALL:  In April of 2019, the defendant pled

20   guilty to an information that had ten counts in it.  Counts One

21   through Three were wire fraud in violation of 18 U.S.C. Section

22   1343.  Counts Four through Six were for money laundering

23   conspiracy in violation of 18 U.S.C. Section 1956(h).  Counts

24   Seven through Nine were substantive money laundering counts in

25   violation of 18 U.S.C. Section 1957.  And Count Ten was for tax

3

1   evasion in violation of 26 U.S.C. Section 7201.

2          A final PSR was issued in this case in March of this

3   year with a number of outstanding objections.  We're now before

4   Your Honor for sentencing in this matter.

5          THE COURT:  Thank you.

6          Mr. Peterson, was a Presentence Investigation Report,

7   including any and all revisions or addenda, provided to

8   Mr. Adkins at least ten days before this hearing?

9          MR. PETERSON:  It was, Judge.

10         THE COURT:  Mr. Adkins, did you receive a copy of the

11  presentence report, including any and all revisions or addenda,

12  at least ten days before this hearing?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Did you review those materials?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Did you review those materials with your

17  attorney Mr. Peterson?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Did Mr. Peterson answer any and all

20  questions that you had with respect to those materials?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Mr. Peterson, are any of the factual

23  statements contained in the PSR disputed by the defense?

24         MR. PETERSON:  Only to the extent of one objection

25  with respect to the leadership role, Judge.  Other than that,

4

1    we have no dispute with the --

2            THE COURT:  We'll take care of that.  We will address

3    all of the objections in a moment.

4            Mr. Shimeall?

5            MR. SHIMEALL:  No, Your Honor.

6            THE COURT:  There being no objections to the factual

7    statements contained in the PSR except with respect to the

8    caveat set forth by defense counsel, the Court hereby accepts

9    those statements as its findings of fact.

10           Mr. Peterson, the defense has several objections to the

11   probation officer's conclusions with respect to the applicable

12   advisory guidelines.  We will consider those objections

13   seriatim.

14           The first objection is to the two-level enhancement

15   pursuant to 2B1.1(b)(10)(C).  Your position, as a headnote,

16   Mr. Peterson, is that the evidence does not support the

17   contention that the wire fraud offense involved sophisticated

18   means as contemplated by 2B1.1(b)(10)(C) as reflected in the

19   commentary to 2B1.1.

20           The Court, of course, has reviewed and read your

21   sentencing memorandum and the analysis contained therein.  So,

22   in summary fashion, do you wish to amplify the defense

23   position?

24           MR. PETERSON:  The only comment I would make, Judge,

25   is the companies that Mr. Adkins used during these offenses

1  were registered in his name.  They were bank accounts that were

2  in his name.  It was relatively, in a kind of a pragmatic way,

3  sort of an unsophisticated way to do this.  It was very easy to

4  track.  It was very easy to monitor the flow of funds.  There

5  were not offshore accounts or any of those things that would

6  rise above the level of any transaction that involved a bank

7  account and companies and corporations and things of that

8  nature.  I would submit that if that's all it takes, then that

9  enhancement would apply to anything when bank accounts or

10  corporations were used.

11      Other than that, Judge, I know you would have reviewed

12  everything we filed, and we stand on our written motion.

13      THE COURT:  Before I pivot to the government, one

14  question that persists as I review these matters in this case

15  in particular, is that it appears that the scheme was uncovered

16  by investigators with the government from the tax division, et

17  cetera.  It doesn't appear that the scheme was uncovered by the

18  various investors.  And it just appears that with all of the

19  different entities that were involved in it and with the

20  various money -- as the government phrased it, large number of

21  back-end money transfers, it would be difficult for the average

22  investor to be able to follow the money and to uncover the

23  scheme.

24      Based on your research and the jurisprudence, do you

25  have any reason to believe that the test should be anything

6

1  beyond that of what a sophisticated investor would be able to

2  uncover or to discern?

3       MR. PETERSON:  I have no facts to dispute your

4  conclusion, Judge.

5       THE COURT:  Mr. Shimeall, the government's position.

6       MR. SHIMEALL:  Only to say that the case law is clear

7  that the sheer number of transactions and number of bank

8  accounts at issue by itself can trigger this sophisticated

9  means enhancement.  There were at least 15 corporate accounts.

10 There were hundreds, at least, transactions related to the

11 fraud scheme.  The sheer size of the fraud scheme --

12 approximately $80 million changing hands through various

13 accounts related to the scheme.  And then there were other

14 issues at play too: a sham escrow agent, a sham tire yard, a

15 sham tire salesman.  We don't think based upon the case law and

16 the facts that it's particularly close, and it was properly

17 assessed here.

18      THE COURT:  I agree.  There were a number of

19 fictitious entities, corporate shells, offshore financial

20 accounts.  These things are patently reminiscent of

21 sophisticated means.  Both the case law, much of what you

22 identified in your papers, make that clear.

23      So, in that respect, Mr. Peterson, your objection is

24 duly noted but overruled.

25      MR. PETERSON:  Thank you, Judge.

7

1      THE COURT:  With respect to Objections Nos. 2 and 3,

2  you object to the enhancement under 2S1.1(b)(3)(B) for

3  sophisticated laundering.  I will turn to you to summarize your

4  argument.

5      MR. PETERSON:  The argument with respect to that, the

6  word really is sophistication.  And so my argument would be the

7  same with respect to the sophisticated means I just referenced.

8  I wouldn't have anything additional.  And, again, I have

9  nothing to contradict the conclusion you reached in that regard

10  as well.

11      THE COURT:  Mr. Shimeall?

12      MR. SHIMEALL:  Only one thing to add, and part of

13  Mr. Peterson's objection is that, look, you're using the same

14  facts to assess both enhancements.  Maybe true to some extent,

15  but there are additional facts related to the money laundering

16  that make that assessment proper, to the back-end number of

17  transactions to cover up the scheme.  We're talking thousands

18  of transactions to funnel between different accounts, to

19  eventually get to accounts controlled by the defendant or

20  controlled by his coconspirators.  That alone, based on the

21  guideline, is enough to trigger the money laundering

22  enhancement as well.

23      MR. PETERSON:  Can I comment?

24      THE COURT:  Yes, you may.

25      MR. PETERSON:  I was just going to address the

1   sophisticated and not the double counting. I should have

2   addressed both because they were in two and three. In

3   paragraph 52 of the presentence investigation is where the

4   sophisticated means -- those two points are calculated into the

5   base offense level through that paragraph. And then in

6   paragraph 55 is the two-level enhancement for the sophisticated

7   money laundering. We were simply suggesting that was a double

8   counting, if you will, based upon the same facts. It resulted

9   in four points when in essence it should have been two. I have

10   no additional comment with respect to that objection, Judge.

11         MR. SHIMEALL: We rest on our papers on point.

12         THE COURT: For essentially the same reasons as set

13   forth with respect to sophisticated means, I find that the

14   government is correct and the probation officer's analysis is

15   correct that the sophisticated laundering means complex or

16   intricate offense conduct pertaining to either the execution or

17   concealment of acts. And that's what we had in this case as

18   graphically set forth in the -- on page 4 of the presentence

19   report's objection sections and where the money laundering

20   activities are detailed. And what it shows in sum and

21   substance is that Mr. Adkins laundered the illegally obtained

22   funds for five years. He made payments to various fictitious

23   accounts, and his associates were in control of many of those.

24   And he controlled them in a way that he could pay the

25   coconspirators for their anticipation in the scheme.

1          For many of the same reasons that I found in Objection

2    No. 3, I find in -- I'm sorry, in Objection No. 1 as a basis

3    for finding sophisticated means, I find those facts also

4    support the notion of sophisticated laundering.  Therefore,

5    your objection is duly noted but overruled.

6          MR. PETERSON:  Thank you, Judge.

7          THE COURT:  The fourth objection is to the

8    recommendation of an aggravating role enhancement pursuant to

9    3B1.1A.

10         Mr. Peterson?

11         MR. PETERSON:  Thank you, Judge.  As indicated in the

12   report, there are -- the investigation revealed five criminal

13   participants, if you will.  I don't know that there's anything

14   that makes Jason any more of a leader than the others.  These

15   people all acted in concert at a relatively similar level of

16   involvement and certainly a similar level of culpability.  I

17   don't believe there's anything about Jason's role that was a

18   leader of the others any more so than they were a leader of

19   him.  I think they were all equally responsible for their

20   actions.  And, obviously, they will all be held accountable at

21   the appropriate time.

22         The only other comment I have is probably more

23   appropriate to make at the bench at the appropriate time if you

24   allow us to do that.

25         THE COURT:  I will.

1    Mr. Shimeall, the government's response.

2    MR. SHIMEALL: Candidly, this was close for us. This

3  was a very close call. It is true that the fraud scheme was

4  complex, and he was integral to the execution of the fraud

5  scheme. He did, in fact, interact with many, many of the

6  victims. And so, of course, they would see him as the primary

7  person in the scheme. What the investigation indicated very

8  clearly was that he was not at the top of the fraud scheme.

9  The investigation is ongoing on that point. And while close,

10  he, at the end of the day, worked in concert as a true

11  coconspirator with other individuals rather than necessarily

12  someone who was the sole director of other people.

13    While we think it's close, we ultimately do not object.

14    THE COURT: And you do not -- you do not --

15    MR. SHIMEALL: Do not oppose.

16    THE COURT: You do not oppose.

17    MR. SHIMEALL: Do not oppose.

18    THE COURT: Ms. Boucher, what is the -- you may step

19  inside the rail, if you wish.

20    ███████████████████████    ████████████████████

21  ███████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████████



24       Mr. Peterson, if you have any belief or any rejoinder to

25 Ms. Boucher's argument or statement, then I'll hear it now

12

1   before I proceed to the next step of my analysis.

2          MR. PETERSON:  I have nothing else to offer, Judge.

3          THE COURT:  Mr. Shimeall?

4          MR. SHIMEALL:  Not at the present moment.  Thank you,

5   Your Honor.

6          THE COURT:  So based on that, then, I find that

7   probation is correct.  There were at least five criminal

8   participants.  At this time, only one of the coconspirators

9   besides Jason Adkins has been charged.  But I find based on the

10  facts set forth herein that Mr. Adkins did have a managerial

11  role over a number of the coconspirators.  He recruited three

12  individuals to participate in the conspiracy, and the

13  conspiracy involved additional unindicted coconspirators who

14  also managed -- who had a managerial role and directed

15  Mr. Adkins.

16       So I find that while Mr. Adkins was not an organizer or

17  leader, he was a manager or supervisor.  Therefore, I believe

18  the enhancement is proper and the enhancement should apply.

19  Your objection, therefore, is overruled.

20          MR. PETERSON:  Thank you, Judge.

21          THE COURT:  Could I see counsel at sidebar?

22                              - - -

23       (The following proceeding was held at sidebar.)

24   ██████████████     ████████████████████████████████████

25   ████████████████████████████████████████████████████████













21    (The following proceeding was held in open court.)

22        THE COURT:  Counsel, based on the objections and the

23    arguments of counsel, I find that the applicable advisory

24    guideline range for Mr. Adkins is Total Offense Level 29,

25    Criminal History Category I.

19

1    Mr. Peterson, what is the defense position with respect

2    to the application of the 3553(a) factors and the judgment that

3    you would urge the Court to impose in this case?

4    MR. PETERSON:  I appreciate that opportunity, Judge.

5    First, I would like to just make a comment.  This was probably

6    the most complicated presentence report that I have ever

7    encountered in my career.  Ms. Boucher and Mr. Shimeall were

8    always open.  We had several conversations in working through

9    the issues, the groupings issues, and all of the complexity

10   that went into that report was extraordinary.  It was -- except

11   for the comments we made earlier -- was spot on, was correct,

12   was thorough, was outstanding.

13   We appreciate the probation department's willingness to

14   discuss those issues with us, as well as the United States

15   Attorney's Office.  Their handling of this investigation, which

16   has now been years, and what they're willing to do in dealing

17   with Jason and our issues that arose over the years truly has

18   reinforced my confidence in the system.

19   We have been treated fairly and professionally at every

20   turn.  Any request we have made throughout this period of time

21   to both probation and the U.S. Attorney's Office, they were

22   accommodating us and always addressed our concerns.  I would

23   like to express my personal appreciation to each of them, to

24   Mr. Glenn-Applegate, Doug Squires, Dave DeVillers.  The

25   attorneys on it before always treated us with respect and

20

1    professionalism.  This is a difficult situation, and I greatly

2    appreciate the way they have handled this throughout the entire

3    years that this prosecution has gone on.

4         THE COURT:  Thank you for saying that on the record,

5    Mr. Peterson.  You just captured what my experience has been

6    for the past 26 years both working with this U.S. Attorney's

7    Office and with probation.  So thank you for reflecting that.

8         MR. PETERSON:  It is a difficult situation.

9         THE COURT:  And it's an adversarial process.  And the

10   fact that you can make that observation in the context of an

11   adversarial process speaks to the integrity of this branch of

12   government.

13        MR. PETERSON:  Absolutely, Judge.  No question.  That

14   would sort of lead me to -- we did submit a sentencing

15   memorandum.  You have the presentence investigation that goes

16   through Mr. Adkins's past and family and history and all of

17   that.  I would simply, in addition to that, highlight from

18   those reports, Judge, that this was not -- ending up in a

19   federal courtroom before you, Judge, being sentenced is not

20   where Jason intended to be.

21        As most, in a lot of these situations, they start out in

22   a more legitimate way.  Things happen and it evolves and then

23   once you start slipping down that slope, it's very difficult to

24   get out of it.  That's how this happened with Jason.  He did

25   not set off intending to end up under federal indictment.

1          His wife Rebecca is here in the courtroom, Judge.  They

2    have three children.  One just started out in California in

3    college.  The other two are still in high school in southern

4    Ohio.  This is a very, very difficult thing for Jason, for his

5    wife, for his family.  Aside from him still accepting

6    responsibility for the mistakes he made and knowledging how he

7    ended up here in taking responsibility for those things, it's

8    been very, very difficult on the family looking at this from

9    the Adkins's side.

10          I won't belabor the point.  His history has been

11   documented through the PSR and through our sentencing

12   memorandum.  I would stand on those comments.

13          I do have a statement that Jason, when appropriate,

14   Judge, would like for me to read to you.  If the government

15   doesn't have any objection, he --

16          THE COURT:  I will typically give the defendant an

17   opportunity to allocute on his behalf.  I wanted to give him

18   sort of the last word.  After I hear from you, I'm going to

19   hear from Mr. Shimeall, and I understand there are a number of

20   victims who either have statements themselves to make or who

21   have statements or at least a statement to be read by

22   Mr. Shimeall.  So, at the conclusion of your individual

23   remarks, I will turn to Mr. Shimeall.

24          MR. PETERSON:  Do you want me to read that now, Judge?

25          THE COURT:  Mr. Adkins is not going to speak on his

22

1 behalf?

2          MR. PETERSON:  Can you do it?

3          THE COURT:  If he is, I will hear from him last before

4 I begin my analysis.

5          MR. PETERSON:  Judge, I believe the sentencing factors

6 that are laid out support the sentence that the government is

7 recommending and that the Court is entertaining, and we

8 wouldn't have any additional comment beyond that.

9          THE COURT:  Thank you very much, Mr. Peterson.

10          Mr. Shimeall, on behalf of the government.

11          MR. SHIMEALL:  Before I speak, there are a number of

12 victims here today.  Obviously, there were several statements

13 submitted to the Court, including one right before the hearing

14 today.  We have, it's my understanding, three victims, if Your

15 Honor will hear them.

16          THE COURT:  I would appreciate hearing from them.

17          MR. SHIMEALL:  First, we would ask Mr. Harold Compton

18 to come forth and speak.

19          THE COURT:  Mr. Compton, would you please come

20 forward.

21          Would you please state your full name and spell your

22 last name for the record.

23          MR. COMPTON:  It's Harold Frederick Compton, Jr.

24 C-o-m-p-t-o-n.

25          THE COURT:  Mr. Compton, please proceed.

1       MR. COMPTON:  Your Honor, I'm here today representing

2   myself and my father Harold Compton, Sr., who couldn't travel

3   from Dallas today.  We were both affected by the actions of the

4   defendant.  Both I and my father had the misfortune of becoming

5   involved financially with the defendant.  I would like to

6   address the Court on the elaborate ways the defendant

7   financially and emotionally scammed my family out of millions

8   of dollars and the damage it's caused myself, my wife, my

9   children, my parents, and my employees.

10      I'm not an extremely wealthy individual, Your Honor.

11  I've grown multiple small businesses over the years with lots

12  of hard work.  And a lot of the money I've made has gone right

13  back into my businesses.  My father and I have invested

14  millions of dollars of personal loans into the growth and

15  sustainability of our companies.  When you account for the

16  substantial fraud and all the gyrations the defendant went

17  through to defraud us and obtain our family's money is mind

18  blowing.

19      The defendant made multiple trips from Ohio to Dallas,

20  Texas, to meet with us and try to convince us to invest in his

21  company.

22      THE COURT:  Mr. Compton, may I interrupt you just one

23  moment?  I have a chart of the victims and the amounts lost.

24  Was yours under a company name?

25      MR. COMPTON:  Yes, Your Honor.  It's called Jenvic,

1    J-e-n-v-i-c.

2            THE COURT:  All right.  I have it.  Please continue.

3            MR. COMPTON:  As I was saying, the defendant made

4    multiple trips from Ohio to Dallas, Texas.  And during these

5    meetings, he walked us through how his company worked, talked

6    about his family and how our investment could help him improve

7    his and our quality of life for our families.  He even offered

8    up his house as collateral to us and gave us a song-and-dance

9    story about how it was worth the risk for the reward for his

10   family and mine.

11           He then proceeded to provide us with more documentation

12   to justify the investment.  He produced serial numbers for

13   multiple tires over the course of our various meetings which we

14   did put secured UCC filings against but without realizing some

15   of these tires didn't even exist and other tires and serial

16   numbers had also been promised to other groups.

17           The time and energy the defendant put into falsifying

18   serial numbers, purchase orders from fake companies, or

19   companies the defendant put together himself without disclosing

20   to us, and the falsified documents from the yard that the tires

21   were stored in is still unimaginable to myself and my family.

22   What kind of person does something like this?  That is the

23   question we all keep asking ourselves.

24           I would like the defendant to understand the pain and

25   agony he's caused my family and my employees due to this

1    heinous, malicious act. Due to him basically stealing our

2    money, we had to take out additional loans to help sustain our

3    business through the COVID pandemic. We are now currently

4    owing interest on loans to our business that we would not have

5    had to pay if we had the money that was taken from us by the

6    defendant. This has caused us to lose even more money.

7         Because we had to tighten our belts through the pandemic

8    like most companies, and we were tighter on cash than we should

9    have been, we had to lay off almost 75 team members which cost

10   them and their families their income. So the defendant

11   personally affected approximately 75 additional people's lives

12   due to the cash constraints he caused myself and my father.

13        Then to add to the business woes, we were in breach of

14   our bank covenants for our personal business loans due to my

15   father and myself not having enough personal wealth on hand to

16   cover the bank's requirements since we had to take out

17   additional loans on our business. We have since worked through

18   all of that with our bank and restored our 13-year relationship

19   but with no help from the defendant's actions. All of this

20   cost us lots of time, payroll and personal grief. We have

21   still not rehired the laid-off team members at my company.

22        On the personal side of my life, the defendant caused a

23   lot of undue emotional stress on myself and my wife. Your

24   Honor, I have two children, a boy and a girl. Figuring out how

25   to juggle our finances so both our children could finish

1    college in the last two years has been extremely stressful on

2    both of us.  Again, if it wasn't for the defendant's actions,

3    we would have easily had the money to cover everything.  But

4    with the additional loans for the business plus two expensive

5    colleges, it was lots of stressful days and nights for both

6    myself and my wife.

7        For a person who stressed during his pitch to us about

8    family and how important it is, I'm hoping the Court takes into

9    consideration that the defendant had no care or concern for my

10   parents, my wife, my children, my team members and their

11   families, or the other plaintiffs in this case.

12       And, Your Honor, this morning to hear when I arrived

13   that it's being considered to only give the defendant 90 months

14   is extremely disappointing, and to hear how difficult it's been

15   for his family was just disgusting.  He made the choice.  He

16   penalized me and my family.  I don't feel sorry at all.  And

17   I'm begging the Court, begging, to make sure that the defendant

18   spends as long as possible in jail for his devastating,

19   fraudulent actions against so many innocent people.

20       That's all I have.  Thank you, Your Honor.

21        THE COURT:  Mr. Compton, thank you very much.

22   Mr. Compton, do you have just a general estimate on how much

23   you lost directly to Mr. Adkins?

24        MR. COMPTON:  Myself was about 1.2 million and my

25   father was an additional 1.2 million, give or take.

27

1          THE COURT:  So somewhere between 2 and 2.4 million?

2          MR. COMPTON:  Yes, Your Honor.

3          THE COURT:  Thank you very much, Mr. Compton.  I

4    appreciate your taking the time to come.  I want you to -- I

5    want you to be very clear that the Court has always, over the

6    past 25 years, paid very close attention to the victims of

7    these offenses.  The public sometimes has a warped sense of

8    what a victim is.  They often think that the only victims of

9    crimes are victims of street crime, and they only sometimes

10   believe that those victims are devastated in their person

11   because of, oftentimes, offenses to the person.  But I

12   understand in very granular ways your pain and your agony and

13   the impact that these misdeeds had on your family.  So I

14   appreciate your sharing them with the Court.

15         MR. COMPTON:  Thank you, Your Honor.  I appreciate it.

16         MR. SHIMEALL:  Your Honor, next we are going to have

17   Mr. Brent Bobo come speak.

18         THE COURT:  Mr. Bobo, please come forward and speak.

19         MR. SHIMEALL:  One moment, too, Your Honor.  We, of

20   course, don't object to the facts laid out in the presentence

21   report, but the loss values on that table are approximate.

22         THE COURT:  And I understand that.  We're going to

23   have a period of an additional 90 days to gather additional

24   facts about the actual loss amount.

25         Mr. Bobo, please state your full name and spell your

1    last name for the record.

2          MR. BOBO:  Brent Bobo.  Last name is B-o-b-o.

3          THE COURT:  Please proceed, Mr. Bobo.

4          MR. BOBO:  Good morning, Your Honor.  I appreciate

5    this opportunity to address the Court.  Jason Eldon Adkins

6    chose a life of crimes of enormous proportions.  Today he will

7    be held accountable for his actions.  He didn't need to commit

8    these crimes in order for him to survive, certainly not the

9    reportedly $50 million.  A criminal scheme of this magnitude

10   required legal maneuvering, drafting of legal documents he had

11   no intention of fulfilling.  He once sent me a fictitious

12   earning statement, 1099, stating I earned an outrageous amount

13   of interest causing me to pay tens of thousands of dollars on

14   nonexistent earnings.

15        I live on a disability retirement.  I can no longer work

16   over time, save for the future.  He stole my financial cushion.

17   I won't be able to purchase an extended care policy for myself

18   or indulge in any of the retirement indulgences like travel,

19   new car.  I'll no longer be donating to something I'm

20   passionate about: dog rescues.  That's out of the picture.

21   I'll be spending -- I won't be spending my money on

22   grandchildren's educations.

23        Jason Adkins lied, deceived and stole money to live a

24   life of luxury: Cadillac Escalades, car collections, leased

25   jet, living lavishly in a large home he built on a gated

1   estate, has a room in the basement with a room like a safe in

2   which he kept collectible firearms, many Super Bowl rings and

3   precious metals.  He has so far expressed no remorse.

4        He called me when he wanted to borrow the final $55,000

5   which I suspect was as the authorities were moving in,

6   unbeknownst to me.  So we loaned it to him.  Knowing that he

7   has my phone number, he never called to apologize for stealing

8   any of the money.  He evidently thinks it's his to keep.

9        What he stole from my business -- it's a small rental

10  business in Athens at Ohio University, is $340,000.  That was

11  our profit from the last seven years of business.  The -- my

12  co-owner and I are contributing funds to the business to keep

13  it afloat until we can liquidate.  He's taken all incentive for

14  us away to even have the business.

15       He stole 900,000 -- I'm sorry, Your Honor -- 90,000 from

16  me personally, and he stole $80,000 that was intended for my

17  father's end-of-life nursing care.  My intention was to

18  multiply that 80,000 for extra years for my father; 80,000

19  being the cost of a year.  No nursing home for dad.  Now he's

20  gone.

21       So because he chose to steal all the money and keep it

22  himself, I'm forced to live frugally so my retirement savings

23  will be available for rising health costs.  I have to buy my

24  own insurance on the marketplace.  It's an $8,000 deductible,

25  $8,700 out of pocket.  And, believe me, it doesn't take long to

1    add up.  I've had to live frugally the past five years.  If I

2    live 20 more years, I'll be living frugally for a total of 25

3    years.  I'd like to see him get 25 years of losing his freedom.

4            And what of the stolen money?  Did he spend it all in

5    eight years?  If he did, imagine the lavish lifestyle he led.

6    In my house, it's going to be hot in the summer, cold in the

7    winter to save on electric bills; patched shirts, mended socks.

8            I believe that's all I have to say, Your Honor.

9            THE COURT:  Mr. Bobo, thank you very much.  I

10   appreciate your taking the time to come forward today.

11           MR. SHIMEALL:  Your Honor, finally, Ms. Jan Shroy.

12           THE COURT:  Ms. Shroy, please come forward.

13           MR. SHIMEALL:  She might have stepped out, Judge.

14           THE COURT:  We'll give her a couple of minutes.  I'll

15   let your victim coordinator --

16           MR. SHIMEALL:  What I'm going to do while she checks

17   is we did receive Ms. Shroy's statement just before today.  It

18   was not one of the ones that was submitted to the Court prior

19   to the hearing.  If I might, Your Honor, just approach

20   Ms. Stash, that Your Honor has the statement that she's going

21   to make.

22           THE COURT:  All right.

23           MR. SHIMEALL:  While we wait for Ms. Stash --

24           THE COURT:  You mean Ms. Shroy.

25           MR. SHIMEALL:  Excuse me.  Ms. Shroy.  If it would

31

1    please the Court, I'm happy to start in on my portion of the

2    remarks.

3            THE COURT:  I don't want you to be truncated,

4    Mr. Shimeall.  So we'll give Ms. Shroy a couple of moments.

5            Ms. Shroy, please come forward.

6            Good morning.  You may go to the podium.  And take your

7    time.

8            Ms. Shroy, would you begin, though, by stating your full

9    name and spelling your last name for the record.

10           MS. SHROY:  It's Jan, J-a-n; Shroy, S-h-r-o-y.

11           THE COURT:  Please proceed, Ms. Shroy.

12           MS. SHROY:  Before I talk about Mr. Adkins, I'd like

13   to talk a little bit about my life and my daughter's life.  I

14   have a daughter with a severe disability.  She has

15   Lennox-Gastaut syndrome.  Since I doubt any of you are familiar

16   with it, let me explain what it is.  She suffers from multiple

17   kinds of seizures which affects her ability to think, to

18   remember, and to function.  She suffers from myoclonic seizures

19   where she can't think but does not lose consciousness, as well

20   as tonic clonic seizures which were previously called grand mal

21   seizures.

22           Her seizures are non-innocuous.  Every one is life

23   threatening with irreversible brain damage.  She is 17 times

24   more likely to die than someone her age.  She was diagnosed at

25   three years of age, and she's 29 years old now.  She has fallen

1    through glass doors, fallen and hit her head on rocks, broken

2    bones, had numerous gashes to her head and face requiring

3    sutures, et cetera. She has had a seizure in water resulting

4    in her being in a coma and on a ventilator for months with a

5    seven-year recovery period with 14 different specialists. Most

6    of her seizures are life threatening.

7       She requires a special diet and over 30 pills and oils a

8    day to live. She does not drive. She does not know how to

9    cook. She cannot bathe by herself for fear of drowning. She

10   is not able to take care of herself. She requires constant

11   care. She has a sleep disorder and behavioral issues

12   associated with her illness. She has taken -- been taken by

13   squad and EMTs more times in a year than I can count. The last

14   one was last week.

15       There is no cure. The illness is progressive. I was

16   told by a very uncaring doctor when she was three years old to

17   find an institution as she would eventually be a vegetable.

18   She is 29, and she isn't able to take care of herself.

19   Unfortunately, there are not enough caregivers in the world and

20   the care for her falls to me. I have taken care of her for her

21   entire life, living most nights on less than three hours of

22   sleep and worked full time for over 40 years. I saved my money

23   so that she could have a future and a better quality of life so

24   when I am gone someone could take care of her. She is very

25   sick and requires a lot of support to live.

33

1      Most people who have children don't have to monitor them

2  24 hours a day to provide emergency care if needed.  As I

3  mentioned, I worked for over 40 years to save so that she could

4  be taken care of.  Now every day I worry how that will happen

5  when I'm gone, how her care will be provided and how her

6  medicines and basic needs will be covered all because of Jason

7  Adkins.

8      Jason Adkins has a different kind of illness.  His

9  sickness is pure greed.  He didn't return phone calls about the

10  money he took from me, but told me through another person not

11  to go to the police or I would never see my money.  After

12  hiring an attorney which required more time and expenses on my

13  part, Jason pled guilty.  He was supposed to provide

14  restitution but never paid a penny.  He has never shown any

15  remorse.  He has never even bothered to say he was sorry

16  because he's not.  I would guess if he's sorry about anything,

17  it's that he got caught.

18      He threw lavish parties and told people he would never

19  go to jail because he has kids.  He was arrogant and spewed

20  outrageous lies constantly and has shown zero remorse.  Yes, he

21  suffers from a different kind of illness, one that is

22  self-inflicted.  He steals.  He lies.  He cheats.  And sadly,

23  this wasn't his first time being involved in a scam.  Perhaps

24  it's the first time he's been caught, but it's not the first

25  time he's participated in a scam.

34

1        My daughter likely won't have the care and support she

2   needs the rest of her life because of him.  But he could care

3   less.  He is a sorry human being, and there is a special place

4   in hell for someone like him.  And I would like to see him have

5   part of that special place in hell right here on earth in

6   prison for a long, long time.

7        He can't give back what he has stolen.  What he has

8   stolen is the quality of my life and my daughter's life.  He

9   has stole my daughter's future all because of his greed.  My

10  daughter didn't choose her sickness, but Jason Adkins chose

11  his.  The choices he made have had severe consequences on my

12  life and my daughter's life.  After years and years of no

13  punishment and no repercussion for what he did, I hope there

14  are severe consequences dealt to him today.

15        THE COURT:  Ms. Shroy, thank you very much.  One other

16  thing, Ms. Shroy.  Approximately how much do you calculate your

17  loss?

18        MS. SHROY:  About a million dollars.

19        THE COURT:  Thank you, Ms. Shroy.

20     Mr. Shimeall, do you have any additional witnesses

21  today?

22        MR. SHIMEALL:  No additional witnesses.

23        THE COURT:  All right.  Please give me the

24  government's position on the 3553(a) factors and the sentence

25  that you would urge the Court to impose in this case.

35

1        MR. SHIMEALL:  Yes, Your Honor.  I want to start with

2   just the scope of the scheme, as I think sometimes it's hard to

3   wrap your hands around what was going on.  It was approximately

4   $80 million, like I said earlier, that went through various

5   accounts related to the scheme.  This is one of the larger

6   fraud cases I think in this district currently going.

7        Beyond just the amount of money at issue, it was

8   sprawling.  There were at least 70 victims from all over the

9   country.  There was money movement through at least 15

10  corporate accounts.  There are two individuals charged now,

11  although the investigation is ongoing.  The scheme involved a

12  sham tire yard, a sham escrow agent, a sham tire salesman,

13  private jets, at least one Super Bowl party, meetings with

14  celebrities, trips around the country, and thousands of

15  transactions.

16        Financial crimes, so far as I see in my experience,

17  don't often come more serious than the one we have here.  You

18  heard the pain associated with the victims in this case.  There

19  were indeed a number of corporate financiers who invested and

20  very wealthy individuals who are indeed victims and who lost

21  money.  There were also many individuals who were not otherwise

22  wealthy, who were working people, who had their security ripped

23  away from them in the long term.  I'm glad that the Court could

24  hear today that they unfortunately are dealing with this, and

25  their suffering is going to continue for a long period of time.

36

1        They're not all here.  There, like I said, are many of

2    them.  I should indicate to the Court that in discussing with

3    the victims the case and whether or not some of them would be

4    willing to come to talk today, there was something we heard

5    often which is, look, I would like to be there and I would like

6    to talk, but it's just too painful.  I can't be there today

7    because it hurts too much.  I suffered too much from this.

8    When you heard Ms. Shroy talk, it's more than just her.  It's

9    many, many people who suffered because of this.

10        I think, Judge, if you look at what happened maybe as

11    one big transaction, it could be said that Mr. Adkins took a

12    step in the wrong direction, and it's a big step in the wrong

13    direction.  But, of course, this was more than just one giant

14    transaction.  This was years of intentional decisions by

15    Mr. Adkins.  It was his decision to get involved.

16        What he said in the sentencing memo -- in Mr. Peterson's

17    sentencing memo is true, that there were other players

18    involved, more sophisticated.  And eventually he did realize

19    what was going on, but he chose to continue.  He chose to go

20    into deal after deal and misrepresent what was going on to

21    victims.  He chose to defraud these people and live a life of

22    luxury on their backs, and that included a large estate, a

23    swimming pool, like I said earlier, a private jet, vehicles.

24    It was luxurious.  He made that decision to keep lying.

25        The guidelines in this case are, admittedly, for a

37

1  white-collar case, high.  I have to say, Judge, in coming to

2  the recommendation we made to the Court, you can hear what the

3  victims think of it.  There was a lot of consternation about

4  this.  This was difficult for us.

5       The conduct is extraordinary.  And while the guidelines

6  are high, we think that they're fair.  But given the totality

7  of the circumstances and everything at play, we ultimately

8  arrived at 90 months.  And we think that is fair given

9  everything that's going on.  Despite what has been said today,

10  we did our best to be fair to everybody.

11       We ask, Judge, that Your Honor impose the sentence that

12  we've requested.  And I think, Judge, with ten counts, it would

13  come to a thousand dollars of a special assessment, as well as

14  three years of supervised release.  And finally, Judge, just

15  for the record, we'd also ask for an order of restitution today

16  with the exact amount to be determined at a hearing at least 60

17  days but no more than 90 days from today pursuant to 18 U.S.C.

18  Section 3664(d)(5).

19       We have worked very hard to pin down the loss amounts at

20  issue.  We're continuing to do that.  But given the sprawl of

21  the fraud, that has taken a good bit of time.  We're coming to

22  the end of the process.  And for that reason, we ask that the

23  order of restitution be made today but a hearing be had between

24  60 and 90 days from now.

25            THE COURT:  At this point, approximately where are you

38

1   in the restitution calculation?  At one time -- I think it's

2   set forth in the presentence report -- restitution exceeds

3   $50 million.

4           MR. SHIMEALL:  It will be right around there.  It

5   vacillates by the transaction that we go through, but it will

6   be pretty close to $50 million.  Probably not take, but give a

7   little bit right around there.

8           THE COURT:  Okay.  And the guideline range under the

9   advisory guidelines of a criminal history level -- I'm sorry,

10  Total Offense Level 29, Criminal History Category I is 87 to

11  108 months.  Is that right, Mr. Shimeall?

12          MR. SHIMEALL:  Yes, Your Honor, that's correct.

13          THE COURT:  And you're recommending something at the

14  low end of that range?

15          MR. SHIMEALL:  Ninety months, Your Honor.

16          THE COURT:  Thank you, Mr. Shimeall.

17      Now, Mr. Adkins, you have had an opportunity to hear

18  from your attorney, to hear from the government, and most

19  importantly to hear from at least three of the victims to your

20  scheme.  Are you now ready to proceed with the statement on

21  your behalf?

22          THE DEFENDANT:  Yeah.  First of all, I apologize to

23  all of the victims.  No, I haven't called them.  I should have.

24  I had their numbers.  A lot of them I didn't have the guts to

25  call them.  I'm sorry about that.

39

1        I do have a letter.

2        Your Honor, I'm writing you this letter hoping you

3    understand more about me and my life.  I'm not writing this

4    letter to feel sorry about myself.  I'm writing you this letter

5    to let you know what kind of person I really am.

6        I was born in a small town in southern Ohio to two great

7    parents.  I was raised to be honest, work hard and care about

8    others.  Growing up with my father, we were very involved in

9    local politics.  I was interested as well.  As a leader of the

10   democrat party, I helped President Clinton during his election,

11   not that he needed it against Bob Dole; very involved with Ted

12   Strickland, along with -- raced cars every weekend with Anthony

13   Celebrezze.  I got to know Anthony very well, spent a lot of

14   time with Anthony.  I was with Anthony when he passed away.  I

15   learned a lot.  I wanted to be in politics.  I went to

16   Anthony's funeral.  I wanted to be a politician.

17       I'm abbreviating a lot of this.

18       My point to this is I wanted to be a well-respected

19   person, not the person I've become.  In 2002 I married the love

20   of my life.  I had three children that I cherish with all of my

21   heart.  I worked hard every day to provide for my family.

22       2009 I met Jerry Ladonna.  He told me how to make money

23   selling these large tires, put me in contact with a guy by the

24   name of John Eckerd.  He said he knew everyone that could help

25   me purchase these tires.  He had John call me.  It was the

40

1    worst mistake in my life by answering that phone.  My life has

2    been a nightmare ever since.

3         Other documents you've seen and I've heard is I was out

4    having the time of my life.  I wish that was the case.  I've

5    lived with threats and pressures and remorse for years; so bad

6    that when my chest would hurt, I would pray it was a heart

7    attack just so this would be over.

8         There's so many people involved.  I've hurt so many

9    people, but I just wanted out.  When my home was raided in

10   2018, I was relieved.  Now, I could finally tell someone.  But

11   for years, I've hurt people when I did not want this to be this

12   way.  The only other outcome was death.  Nobody knows the

13   people I was around, people I was dealing with, even my own

14   attorney, and Bernie Kerik.

15        I've made terrible mistakes.  I have hurt a lot of

16   people.  I never intended doing this.  I have terrible remorse

17   for what I've done and the people I've hurt.  The victims will

18   never understand how sorry I am.  And the only way I knew to

19   help them was to help the government with investigation.

20        My whole point to this letter was I wished I never

21   changed path.  I wish I stayed in politics.  And now I'm not

22   even allowed to vote.  I wish I had been an honest person to

23   never hurt anybody just to survive.  I never want to hurt

24   another person.  I've lived with this burden for years.  I

25   don't want to do it again.  I want to be a good husband,

41

1   father, friend.  I expect -- accept responsibility for my

2   actions.  I just want you to know it's not the man I am.  It's

3   the man I became over the years.  I never want to be this

4   again.

5              Thank you for your time, Your Honor.

6              THE COURT:  Thank you, Mr. Adkins.

7         Mr. Peterson, do you have anything further before the

8   Court begins its analysis of the 3553(a) factors and proceed to

9   sentencing?

10             MR. PETERSON:  The only thing I would mention, Judge,

11  is we did file a motion with respect to self-surrender.  Other

12  than that, I have nothing else.

13             THE COURT:  We'll take that up.

14             MR. PETERSON:  Yes, sir.

15             THE COURT:  Mr. Adkins, as I'm sure that Mr. Peterson

16  has advised you, the Court is tasked with the responsibility of

17  imposing a sentence that is sufficient but not greater than

18  necessary to comply with the purposes of the Congress as set

19  forth in the statutes of conviction.

20        The first inquiry is actually a balancing test.  It is

21  to balance the seriousness of the offense against your personal

22  history and characteristics.  It is almost patently easy to

23  discuss the seriousness of the offense, especially against the

24  backdrop of the victims' testimony here today.  They have made

25  it clear as to not only the nature of the offense -- lawyers

42

1    appreciate that, lawmakers appreciate that, but victims more so

2    than anyone can illustrate why we have these laws on the books

3    because they can tell you in very basic human terms of the harm

4    that was visited upon them by your misdeeds.  Oftentimes, when

5    the victim is not the victim of a personal, physical harmful

6    act, those victims may appear to some to be abstractions.  Some

7    would even be so brazen to say it was only money.  But when you

8    consider Ms. Shroy, it was not only money.  It was a life.  It

9    was the life of her daughter.  And all of us who are fortunate

10   enough to be parents can understand the gravity of the harm.

11        So no amount of apologia will suffice to put Ms. Shroy

12   back in the position she deserves to be in if for no other

13   reason than her daughter.  She didn't ask anything for herself.

14   And most of us parents are selfless.  So it's important to put

15   faces and lives upon victims.  You have to understand it.

16        So I don't have to tell you about the wrong of wire

17   fraud, money laundering conspiracy, money laundering, or tax

18   evasion, especially tax evasion.  Most people might even shrug

19   and say we pay too many taxes anyway.  So if you got away with

20   it, that's fine.  But if you ask Mr. Bobo or Mr. Compton and

21   Mr. Compton, Sr., or the other -- there were 70 victims here.

22   This is just a random sample.

23        So there's nothing that can be done or said that will

24   minimize the nature of the fraud.  It would even be as bad if

25   it was institutional investors only where you might have a

43

1   pension fund. But the pension fund exists for the benefit of

2   people. And they exist for the benefit of people like Mr. Bobo

3   who thought that he had saved the best for the last act or the

4   autumn of his life when people retire.

5          So, to me, what you've done is just as bad as if you had

6   gone to their houses armed with the weapon of choice these

7   days, an AK, and deprived them of their treasure and, in doing

8   so, deprived them of some not insignificant portion of their

9   lives. So that's put into context what you've done. It was

10  not just money.

11         Mr. Shimeall and the government will order restitution,

12  and you will be tasked with the responsibility, along with your

13  coconspirators, to pay this money back. But there will be

14  dreams that will never be recaptured. And when we can't dream,

15  query the quality of our lives. When we can't realize our

16  dreams, tell me about the quality of one's life. Because you

17  have children and you want your children to have dreams and you

18  want them to be able to realize those dreams.

19         So I don't want you to think for a moment that you have

20  absolved yourself or you have vindicated yourself. They and

21  the other victims of this scheme of yours with your

22  coconspirators may accept your apologies. The humanism in them

23  may allow them to do so. But you have to make them as real as

24  the tires that you did not make real. And you must do that, of

25  course, by restitution.

1           There is nothing in your personal history that will

2    justify what you did.  You had a -- as you set forth in your --

3    in the presentence report, you had a good and stable life,

4    something that you have deprived the victims of this offense.

5    You detail that you had a good upbringing.  You were reared by

6    both parents in a loving home.  That is something of which some

7    of these victims will be deprived, Mr. Adkins.  And I want to

8    say it.  I want to say it on behalf of the victims who have

9    spoken here today.  I want to say it on behalf of the victims

10   who were silent.  I want to say it on behalf of the victims who

11   have been -- who might be a part of a fund that invested in

12   your scheme and people who are yet maybe not identified as

13   individuals and whose narratives we don't yet have.  And you

14   need to know it and you need to feel it because that's going to

15   be a part of your healing.

16          Now, even if you were to complain to the Court that your

17   circumstances were in no ways idyllic and as a consequence you

18   resorted to avarice to close the delta, that still wouldn't be

19   sufficient because your demographics don't equal your destiny,

20   nor should your avarice result in their loss.  You had a

21   business.  You could have used your fiscal creativity to expand

22   that business lawfully.  Others do it all the time.  And those

23   who don't usually will see Mr. Shimeall or Mr. Glenn-Applegate

24   or Mr. Kelley at some point in time.  And I don't wish that

25   misfortune upon any of them, but you will be caught.

1    The sentence that I will impose must reflect the

2    seriousness for the offenses that you committed in order to

3    promote respect for the law and to provide just punishment for

4    the offense.  That is the retributive ideal of justice,

5    Mr. Adkins.  Society is punishing you for violating its

6    criminal laws.

7    The sentence must afford adequate deterrence to criminal

8    conduct.  There are two interests of deterrence that this seeks

9    to vindicate, Mr. Adkins.  One is general deterrence such that

10   anyone who reads about, hears about, or otherwise discovers the

11   sentence that was visited upon you will be dissuaded from

12   engaging in the same or similar acts of criminality lest they

13   suffer the same or similar fate.

14   The other and more important interest of deterrence that

15   is sought to be vindicated is specific deterrence.  That is, I

16   want to impose a sentence upon you that is severe enough that

17   it will dissuade you from not just future criminality in this

18   realm but future criminality period lest you suffer the same or

19   greater fate.

20   The sentence must protect the public from further crimes

21   of the defendant.  That is the incapacitation ideal,

22   Mr. Adkins.  The theory being that if you are locked away, and

23   you will be, you will not be able to commit crimes in free

24   society.  And finally, the sentence must provide you with

25   needed educational or vocational training, medical care, or

46

1    other correctional treatment in the most effective manner.

2    That's the rehabilitative ideal, Mr. Adkins.  As Mr. Shimeall,

3    Mr. Glenn-Applegate, Mr. Peterson who himself was a judge and a

4    very outstanding judge who struggled with these same issues,

5    Mr. Kelley, they will all tell you one thing.  They will tell

6    you that Judge Marbley struggles with this particular prong

7    because I don't know -- if you were -- had committed these

8    crimes to fuel your addiction, your drug addiction, the BOP has

9    the RDAP program, Residential Drug and Alcohol Treatment

10   program.

11        But for 25 years, this Court has struggled with how to

12   rehabilitate avarice.  I have yet to discern how one would

13   rehabilitate one from avarice.  It's part of the frayed end of

14   the American fabric.  We hear stories of greed all the time.

15   In pop culture it was said that greed is good.  And in that

16   context, it is greed for knowledge, greed for progress, greed

17   for betterment, greed for vindication of American values, the

18   ideal of America, then greed is good.  But avarice is that

19   brand of greed that is not because of what happened to

20   Mr. Compton, because of what happened to Ms. Shroy, because of

21   what happened to Mr. Bobo.

22        I have no doubt, as Rousseau would say, that you were

23   born with a clean slate and that you were born fundamentally

24   good.  But somewhere something happened.

25        Mr. Adkins, I once had a case.  It was a death penalty

1    case.  And we don't get many death penalty cases here in

2    federal court.  And in that case -- and I was fortunate to

3    preside over it because I heard the best and the most powerful

4    closing argument that I've heard in 25 years on this court.

5    The defendant was standing up and his defense attorney,

6    Mr. Fred Benton, who is a great trial lawyer, stood up and

7    said -- he showed a picture of the defendant as a little boy at

8    Christmastime, and he had just gotten a cowboy suit.  He was

9    happy and he was regaled in his cowboy suit.  And this was the

10   same defendant who had been responsible for the -- for

11   murdering a man, I believe a woman, and his daughter, the

12   defendant's daughter.

13        He posed the question.  He asked the jury to look at

14   this picture of the young man as a little boy and to look at

15   the defendant standing before them.  And the question that he

16   put to the jury was what happened between here and here?  What

17   happened between the time that this little boy was just a

18   little tot enjoying being a cowboy at Christmastime to him

19   being a murderer?

20        And the same question could be posed to you, Mr. Adkins,

21   because you weren't always avaricious to the point where you

22   could steal from people without regard for the impact that that

23   would have on those people.  Something happened.  And I don't

24   know whether there's any program that the Bureau of Prisons

25   could construct that could remedy that, that could address

1    that, that could solve that.  But something happened.  But

2    you're going to have time to reflect.  That's the beauty of it.

3    You're going to have time to reflect on what got you from the

4    young man who had an interest in politics, to do good for a

5    greater good, to support candidates of your choice who you

6    thought would do good for the greater good, to have a business

7    where you would provide a service for people without resort to

8    ripping them off or anything.

9        You were a tire salesman, but then you took a detour.

10   What we don't know is what sign along the way caused you to

11   take that detour because you're not an unsophisticated man.

12   You're a smart man.  You were able to develop a scheme that

13   ripped off people for $50 million.  That takes some mental

14   acuity.  And so I hope that in the counseling that you will be

15   ordered to undergo, it can be unearthed and the question could

16   be answered as to what happened to that man.

17       I will now state the sentence that I intend to impose,

18   but counsel will have a final opportunity to make any legal

19   objections before sentence actually is imposed.

20       Ms. Boucher, may I see you for one moment at sidebar?

21     (Thereupon, Court and Ms. Boucher conferred out of the

22   hearing of open court and off the record.)

23         THE COURT:  Pursuant to the Sentencing Reform Act of

24   1984 and 18 United States Code Section 3553, et seq., it is the

25   judgment of the Court that the defendant, Jason E. Adkins, is

1    hereby committed to the custody of the United States Bureau of

2    Prisons to be imprisoned for a term of 108 months on Counts 1

3    through 9 to be served concurrently, and 60 months on Count 10

4    to be served concurrently with Counts 1 through 9.  Upon

5    release from the custody of the Bureau of Prisons, the

6    defendant shall serve a term of supervised release of three

7    years on each count to be served concurrently.

8         Within 72 hours of release from the custody of the

9    Bureau of Prisons, the defendant must report to the probation

10   office in the district to which he is released.

11        While the defendant is in the custody of the Federal

12   Bureau of Prisons, the defendant shall participate in mental

13   health counseling with a particular focus on decision making.

14   While on supervised release, the defendant must not commit any

15   federal, state or local crimes.  He shall be prohibited from

16   possessing a firearm, ammunition, destructive device or

17   dangerous weapon.  The defendant must not unlawfully possess a

18   controlled substance.  He must refrain from any unlawful use of

19   a controlled substance.

20        The defendant is viewed as a low risk of future drug

21   use, and the mandatory drug testing condition is waived

22   pursuant to 18 United States Code Section 3583(d).  He must

23   cooperate in a collection of his DNA as directed by the

24   probation officer.  He must comply with the standard conditions

25   of supervised release that have been adopted by this court, as

50

1    well as the following special conditions.  He will have no

2    direct or indirect contact with the victims or his codefendants

3    without the prior written consent of the probation office.  He

4    shall cooperate with the IRS and pay all taxes due and owing.

5    He must pay restitution in the amount of $236,665 to the IRS.

6         He shall participate in a program of mental health

7    assessment and/or counseling as directed by the probation

8    office until such time as he is released from such program by

9    the probation office.  He will make a copayment for treatment

10   services not to exceed $25 per month which is determined by his

11   ability to pay.

12        He shall provide all financial and bank records to the

13   probation office as directed.  He shall file with the IRS

14   complete and accurate individual tax returns for tax years

15   2008, 2009, 2010, and 2011.

16        I find that the defendant does not have the ability to

17   pay a fine.  He shall pay restitution in an amount that will be

18   finally determined within 90 days of today's date.  Restitution

19   shall be paid jointly and severally with any unindicted person

20   who is convicted in respective charges.  Restitution is due

21   immediately with any unpaid balance to be paid in the amount of

22   not less than 10 percent of the defendant's net income per

23   month.

24        While incarcerated, if the defendant is working in a

25   nonUNICOR or Grade Five UNICOR job, he shall pay $25 per

1  quarter toward his restitution obligation.  If working in a

2  Grade One through Four UNICOR job, the defendant shall pay

3  50 percent of his monthly pay toward the restitution and fine

4  obligation.  Any change in this schedule shall be made only by

5  order of this Court.

6       Pursuant to 18 United States Code Section 3612(f)(3)(A),

7  I waive the requirement of interest on any balance of the

8  restitution and fine not paid within 15 days after judgment.

9  It is ordered that the defendant pay a special assessment in

10 the amount of $1,000 which shall be due immediately.  The

11 defendant is subject to forfeiture as outlined under the terms

12 of the plea agreement.

13       Are there any objections to the sentence as stated,

14 Mr. Peterson?

15           MR. PETERSON:  No, Your Honor.

16           THE COURT:  Mr. Shimeall?

17           MR. SHIMEALL:  Not on behalf of the government, Your

18 Honor.

19           THE COURT:  The sentence as stated will be imposed.

20       Mr. Adkins, you may appeal this sentence on one of two

21 grounds or both of them.  You may appeal this sentence if you

22 believe that Mr. Peterson rendered ineffective assistance of

23 counsel, or you may appeal if you believe that Mr. Shimeall,

24 Mr. Glenn-Applegate, or any one of the attorneys in the United

25 States Attorney's Office has been guilty of prosecutorial

52

1    misconduct.

2         If you wish to appeal on one of these two bases or both

3    of them but cannot afford an appeal, you may apply for leave to

4    file an appeal *in forma pauperis* which means without the

5    payment of any cost or expense to you.  If that application is

6    granted, the clerk of court will prepare or file a notice of

7    appeal on your behalf.  Any such notice of appeal must be filed

8    within 14 days of the time that I enter judgment on your

9    sentence.

10        Do you wish the Court to direct the clerk's office to

11   prepare or file a notice of appeal on your behalf?

12        THE DEFENDANT:  No, Your Honor.

13        THE COURT:  Are there any other matters -- we need to

14   take up the matter of self-surrender.

15        MR. PETERSON:  We filed a motion requesting

16   self-surrender for the reasons we set forth including an

17   attachment that are relatively sensitive in nature.  We would

18   request that you consider that motion for the reasons that we

19   said.  Also recognizing your limited ability to impact his

20   assignment, we would request that it be considered he be

21   assigned to the Ashland Correctional Institute which is closest

22   to his home.

23        THE COURT:  I will make that request in my judgment

24   and commitment order.  As you know, the Bureau of Prisons will

25   honor that request if possible.  It always depends on staffing

53

1   parameters and what is available at the particular time.  But

2   they give weight to what the sentencing judge recommends, and I

3   will make that recommendation.

4          MR. PETERSON:  Greatly appreciate it, Judge.  Thank

5   you.

6          THE COURT:  Mr. Shimeall?

7          MR. SHIMEALL:  As you probably saw, Mr. Adkins has

8   performed well on pretrial release.  We did vet the issue

9   raised with respect to the motion about self-surrender.  And

10  for that reason, we do not oppose Mr. Peterson's request.

11         THE COURT:  What was the time period?

12         MR. PETERSON:  We would request, Judge, the beginning

13  of December for actual reporting.

14         MR. SHIMEALL:  We have no objection to that.

15         THE COURT:  Say December 1?

16         MR. PETERSON:  That will be fine, Judge.  It's related

17  to a medical issue.  If something else arises, we would maybe

18  approach --

19         THE COURT:  You can come back, but just to have a date

20  certain.

21         MR. PETERSON:  Yes, sir.  Thank you very much, Judge.

22         MR. SHIMEALL:  No objection.

23         THE COURT:  If there's nothing further, this matter is

24  dismissed.

25             (Proceedings concluded at 10:45 a.m.)

54

- - -

1

2

3

4

5                 C E R T I F I C A T E

6

7          I, Shawna J. Evans, do hereby certify that the

8     foregoing is a true and correct transcript of the proceedings

9     before the Honorable Algenon L. Marbley, Judge, in the United

10    States District Court, Southern District of Ohio, Eastern

11    Division, on the date indicated, reported by me in shorthand

12    and transcribed by me or under my supervision.

13

14

15                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
16                              Official Federal Court Reporter

17

18                              January 25, 2024

19

20

21

22

23

24

25